2026 IL App (3d) 250124
Nos. 3-25-0124, 3-25-0205, 3-25-0293 (cons.)

Opinion filed July 10, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| *In re* PARENTAGE OF A.L.G., a Minor | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| (Stephen Guzman, | ) | Du Page County, Illinois. |
| | ) | |
| Petitioner and Counterrespondent- | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | (Appeal No. 3-25-0124) |
| | ) | Circuit No. 20-F-16 |
| Breanne Selin, | ) | |
| | ) | |
| Respondent and Counterpetitioner, | ) | |
| | ) | |
| (Michael D. Canulli, | ) | The Honorable |
| | ) | Maureen R. Riordan, |
| Contemnor-Appellant)). | ) | Judge, Presiding. |

_____

JUSTICE ANDERSON delivered the judgment of the court, with opinion.
Presiding Justice Hettel and Justice Peterson concurred in the judgment and opinion.

_____

**OPINION**

¶ 1     The parties have returned to this court with three more appeals, proving once again that, in domestic litigation, finality is sometimes more aspiration than achievement. This is a parenting case involving Stephen Guzman, Breanne Selin, and their child, A.L.G. We last addressed this

long-running dispute in *In re Parentage of A.G.*, 2024 IL App (3d) 240003-U, *appeal denied*, No. 130938 (Ill. Aug. 22, 2024). The parties are back, again. This time, we have three appeals that involve rulings adverse to Breanne, including (1) two direct criminal contempt findings against Breanne's attorney, Michael Canulli, for making speaking objections (appeal No. 3-25-0124); (2) an award of monetary sanctions in favor of Stephen (appeal No. 3-25-0205); and (3) a series of other posttrial motions (appeal No. 3-25-0293). We consolidate these appeals for purposes of decision.

¶ 2       Having reviewed the extensive record, we conclude in appeal No. 3-25-0124 that counsel's objections did not rise to the level of violating the trial court's admonishment; thus, we reverse the direct criminal contempt findings. We affirm the award of sanctions entered against Breanne and her trial counsel in appeal No. 3-25-0205. In appeal No. 3-25-0293, we affirm the denial of Breanne's posttrial motions relating to the reopening of the proofs, child support, the allocation of health insurance premiums for the minor child, and other ancillary rulings discussed below in more detail. We reverse the denial of Breanne's request to change the minor's name and remand the cause for an evidentiary hearing on that issue. Finally, we reverse and remand the award of retroactive child support and remand the cause to the trial court for the entry of an order awarding additional retroactive child support from March 10, 2020, to January 1, 2021, with Stephen receiving credits for the voluntary support payments he made to Breanne during that period.

¶ 3                                I. BACKGROUND

¶ 4       During the course of their relationship, Stephen and Breanne had a child, A.L.G., who was born on December 14, 2017. The parties subsequently ended their relationship, and Breanne moved out of the house owned by Stephen. The two shared parenting time and responsibilities, jointly making decisions and caring for A.L.G. On January 9, 2020, Stephen filed a petition for

allocation of parenting time and parenting responsibilities in the circuit court of Du Page County, requesting a reasonable allocation of parenting time and joint decision-making on the major issues affecting A.L.G. Breanne filed a counterpetition seeking the allocation of parenting time and parental responsibilities, child support, and other relief on March 9, 2020. Extensive trial and posttrial proceedings followed, spanning multiple years and 15 days of trial. Those proceedings are detailed more fully in *In re A.G.*, 2024 IL App (3d) 240003-U. In that unpublished decision, this court resolved the direct appeal of the trial court's June 7, 2023, allocation order, affirming that judgment.

¶ 5        On June 28, 2023, the case was automatically reassigned from Judge Richard D. Felice to James D. Orel, after the addition of more court rooms to the domestic relations division. After Judge Orel recused himself, the case was temporarily returned to Judge Felice, before being reassigned by administrative order to Judge Maureen R. Riordan. Judge Riordan heard the remaining posttrial motions and petitions attacking the allocation order filed by Breanne (discussed more fully *infra*) before denying them. Breanne appealed from those adverse rulings in appeal No. 3-25-0293.

¶ 6        After the entry of the allocation order, Stephen filed a petition seeking sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) against Breanne and Canulli in July 2023. The request for sanctions was premised on the filing of at least 30 petitions and motions by Breanne and Canulli, including a March 2023 petition seeking a finding of indirect civil contempt against Stephen and his attorney, Angel M. Traub, for allegedly perpetrating a fraud on the court by failing to inform it that Stephen was expecting another child during the course of the proceedings.

¶ 7        During the two-day hearing on Stephen's sanctions petition that began on October 17, 2024, Canulli entered numerous objections to questions Traub posed to Stephen, her client. At

3

various points, the trial court instructed Canulli to refrain from making "speaking objections." The trial court later found Canulli in direct criminal contempt for making two additional "speaking objections," in violation of its order.

¶ 8 The hearing on Stephen's motion for sanctions was continued until February 5, 2025. At its conclusion, the trial court invited Canulli to enter a statement in allocution of the contempt findings. In his statement, Canulli denied any showing of disrespect to the court and maintained that professional and fiduciary duty to his client required him to make an adequate record of any objections that he believed were "appropriate." He also stated that he "certainly would apologize *** if the Court perceived that as being disrespectful." The trial court judge indicated that she did not have a specific memory of the incident and had not reviewed the transcript from the hearing before reaffirming the two findings of direct criminal contempt and imposing a $25 fine for each on February 5, 2025. Canulli filed a timely notice of appeal from that contempt order in appeal No. 3-25-0124.

¶ 9 On March 20, 2025, the trial court awarded $16,257 in sanctions against Breanne and Canulli, pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). The sanctions were awarded after a two-day hearing in which the trial court determined that Canulli and Breanne had filed numerous motions for an improper purpose, intentionally adding unnecessary delay and needless expense to the underlying proceedings. Canulli and Breanne appealed from the sanctions award in appeal No. 3-25-0205.

¶ 10                                          II. ANALYSIS

4

¶ 11    Before this court, Canulli and Breanne collectively raise three issues, claiming that the trial court erred by (1) finding Canulli in direct criminal contempt for making two "speaking objections" after being repeatedly directed not to do so, (2) awarding sanctions to Stephen that were not supported by the evidence, and (3) denying Breanne's numerous posttrial challenges to the allocation judgment.

¶ 12                    A. Direct Criminal Contempt (Case No. 3-25-0124)

¶ 13    In appeal No. 3-25-0124, Canulli argues that the order finding him in direct criminal contempt was not supported by evidence establishing his guilt beyond a reasonable doubt. *O'Leary v. Allphin*, 64 Ill. 2d 500, 512 (1976) ("In criminal contempt proceedings it is necessary that guilt be proved beyond a reasonable doubt."). We agree.

¶ 14    Speaking objections are defined as objections that go beyond simply stating a proper legal ground and instead inject commentary, argument, or subtle coaching into the proceedings. See, *e.g.*, *Specht v. Google, Inc.*, 268 F.R.D. 596, 598 (N.D. Ill. 2010) ("Objections that are argumentative or that suggest an answer to a witness are called 'speaking objections' and are improper under [Federal] Rule 30(c)(2)."); *Wang v. You Garden Dumpling, Inc.*, No. 20 CV 4588, 2025 WL 3522718, at *3 (RER) (CLP), slip op. (E.D.N.Y. Dec. 9, 2025) (stating that under Fed R. Civ. P. 30(c)(2), "[a]n objection must be stated concisely in a nonargumentative and nonsuggestive manner"); *Huffman v. Forest River, Inc.* No. 23-4091 (D. Kan. Nov. 25, 2025) (mem. order) (explaining that speaking objections are overly verbose and may suggest answers to pending questions)); *McDonough v. Keniston*, 188 F.R.D. 22, 24 (D.N.H. 1998) ("Speaking objections and coaching objections are simply not permitted in depositions in federal cases."); *Williams v. Alexander*, 24-492, p. 9 n.7 (La. App. 5 Cir. Oct. 17, 2025); 426 So. 3d 55, 66 n.7 ("We observe that the trial court allowed the parties to engage in extensive speaking objections

and arguments in the presence of the jury throughout the trial. [La. Code Evid. Ann. art. 103(C) (2025)] clearly provides that '[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or asking questions in the hearing of the jury.' "). In practice, speaking objections often take the form of statements such as "[o]bjection, that mischaracterizes the testimony because earlier the witness said" or "[o]bjection, the document speaks for itself, but counsel is misleading the record," which are merely arguments disguised as objections.

¶ 15        In presiding over a bench trial, the trial court is empowered to prohibit speaking objections under its inherent authority to manage its own docket and courtroom. See *People v. McKinley*, 2017 IL App (3d) 140752, ¶ 22 (noting that a trial court possesses the inherent authority to control its own courtroom and docket and possesses wide discretion in managing all aspects of a proceeding). That prohibition is justifiable because speaking objections are unnecessary, inefficient, and disruptive: as the factfinder, the judge does not need advocacy embedded within objections to filter or interpret the evidence. Speaking objections unduly slow the presentation of proof, create an incomplete or distorted record, and risk transforming routine evidentiary rulings into arguments. See *Mitnor Corp. v. Club Condominiums*, 339 F.R.D. 312, 318 (N.D. Fla. 2021) ("Regardless of their motivation and purpose in a particular context, speaking objections are impermissible because they inhibit the truth-seeking function of depositions."). By limiting counsel to concise, nonargumentative objections—such as "objection, hearsay" or "objection, relevance"—the court preserves the integrity of the trial, ensures a clean record for review, and maintains orderly and efficient proceedings. See *id.* (stating that "an attorney's objections during a deposition 'should be succinct and verbally economical, stating the basis of the objection and nothing more.' [Citation.]"). Of course, a trial judge may always request additional argument on

6

an objection, and a lawyer may ask to make a record of the specific bases for their legal objection, an option that was frequently employed by Canulli. The trial judge is tasked with striking a balance between the competing interests of efficiency, making a complete record, and maintaining courtroom order and decorum.

¶ 16　　To be sure, our review of the record reveals that Canulli unrelentingly peppered Traub's direct examination of her client with multiple objections. At times, those objections were made all at once; at other times, they slowly emerged in a prolonged string, with a new objection popping up immediately after the prior one was overruled. The volume and duration of those objections often required Traub to restate the pending question because the witness could no longer remember it, significantly slowing the pace of the October 17, 2024, hearing. The record further reveals that at least some of Canulli's objections were, indeed, "speaking objections," not limited to a brief identification of the underlying legal basis. More than once, Canulli even appeared to argue the validity of the court's overruling of his objection and to demand an additional explanation, despite the trial court's repeated instruction that the hearing would move on after a ruling was entered and its subsequent refusal to engage in further dialogue.

¶ 17　　Nonetheless, the findings of direct criminal contempt in this case were premised on two specific objections made by Canulli shortly after being warned that "any further speaking objections and [he would] be held in direct criminal contempt of court." The first direct criminal contempt finding was entered after the following colloquy:

　　　　"MS. TRAUB: Do you know how much in fees you incurred for the January motion for—to—for Breanne to have the tax dependency exemption?

MR. CANULLI: Objection. Assumes facts not in evidence and also would be hearsay. It also lacks foundation. He also is not the person who did the work, so he wouldn't know."

MS. TRAUB: Objection. Your Honor.

THE COURT: Mr. Canulli, that's your first count of direct criminal contempt. We'll address sanctions at the end.

Your objections are overruled."

Immediately prior to the trial court's second finding of direct criminal contempt, Canulli again made a series of objections to the same question. Traub then stated: "Your Honor, I think he's also been told to do all his objections at once. When you overrule it, he just comes up with another objection. That's not proper. It's just not proper. The way he is proceeding is not proper. Your Honor, he's been admonished many times." The trial court subsequently invited Traub to re-ask her question, leading to this exchange:

"MS. TRAUB: Did you incur fees for the excessive and duplicative petitions filed in this matter after the judgment was entered?

MR. CANULLI: Objection to excessive and duplicative. There is no evidence of either.

MS. TRAUB: Your Honor, I did ask—-

THE COURT: That's your second count of direct criminal contempt, Mr. Canulli. The objection is overruled."

¶ 18    A valid finding of direct criminal contempt of court is premised on "conduct [that] was calculated to embarrass, hinder or obstruct a court in its administration of justice, to derogate from its authority or dignity or bring the administration of law into disrepute." *People v. Siegel*, 94 Ill.

8

2d 167, 171 (1983). "The intent to commit contempt of court may be inferred from the contemnor's actions [citation], although a finding of contempt will not stand where it is shown that the attorney acted in good faith to serve her client and the court [citations]." *Id.* In *People v. Simac*, 161 Ill. 2d 297, 306 (1994), our supreme court explained that a finding of direct criminal contempt must be supported by a showing of

> "contemptuous conduct occurring 'in the very presence of the judge, making all of the elements of the offense matters within his own personal knowledge.' [Citation.]   On appeal, the standard of review for direct criminal contempt is whether there is sufficient evidence to support the finding of contempt and whether the judge considered facts outside of the judge's personal knowledge. [Citation.]"

¶ 19     The range of conduct that may fall under the umbrella of criminal contempt

> "covers the entire gamut of disrespectful, disruptive, deceitful, and disobedient acts (or failures to act) which affect judicial proceedings. Perhaps the most readily recognizable example is an outburst on the part of spectators or litigants which disrupts judicial proceedings. [Citations.] Also punishable as criminal contempt are statements made in open court which suggest that trial judges are guilty of criminal conduct [citation], the filing in court of a spurious will and an application for its probate [citation], and communications with jurors intended to influence the outcome of litigation [citation]. Criminal contempt may also consist of disobedience of a court order [citations] and, of particular relevance to the case at bar, of a failure by an attorney to abide by an injunction concerning proceedings in another court in which the attorney represents one of the litigants. [Citation.]." *In re Marriage of Betts*, 200 Ill. App. 3d 26, 45 (1990).

To support a finding of direct criminal contempt, "there need not be a specific manifestation of contemptuous intent. Rather, such intent may be inferred from the nature of the contemptuous act and the surrounding circumstances." *Id.* at 49.

¶ 20    In his statement of allocution at the end of the sanctions hearing, Canulli declared that he "certainly would not ever do anything that would be disrespectful of the Court or that the Court might perceive as being disrespectful. I am required as a lawyer to represent my client; and I'm required, especially in a contested hearing, to make objections that I think are appropriate. I am also required to make a record for the appellate court in case the case ever does go up on appeal."

After asserting that he had read the transcript of the relevant hearing, Canulli denied exhibiting any signs of disrespect to the court through his tone, manner, or conduct. He claimed that "everything I did I felt obligated to do as an attorney for [Breanne]. And, again, I certainly would apologize to you if the Court perceived that as being disrespectful." He concluded by stating that his objections merely fulfilled his fiduciary duty to his client.

¶ 21    After closely examining the transcript of the October 17, 2024, hearing and Canulli's later statement in allocution, we conclude that the two sets of objections cited by the trial court are not sufficient to warrant findings of direct criminal contempt beyond a reasonable doubt. The bar for that finding is necessarily quite high, particularly when the underlying conduct involves counsel's purported good faith attempts to represent a client in a hotly contested proceeding. See *Siegel*, 94 Ill. 2d at 171 (stating "a finding of contempt will not stand where it is shown that the attorney acted in good faith to serve her client and the court").

¶ 22    In *Simac*, the supreme court affirmed a finding of direct criminal contempt against the defendant's trial counsel only after finding that counsel had engaged in "subversive tactics [that]

10

impeded the court's ability to ascertain the truth." *Simac*, 161 Ill. 2d at 313. The court concluded that defense counsel's "conduct clearly reveals that his intent was not merely to test the State's identification testimony. Rather, we find that appellant intended to cause a misidentification, thereby misleading not only the State and its witness but also the court itself." Here, the conduct underlying the trial court's contempt findings does not involve any deception of the trial court or other act that would rise to that extreme misconduct.

¶ 23 Although Canulli's conduct was needlessly combative and undoubtedly slowed the proceedings, causing repeated frustration for both the trial court and Traub, the trial court specifically cited him for violating its admonishments to refrain from making further speaking objections. After looking at those specific objections, we do not believe that the court's characterization was correct insofar as it concluded that Canulli's conduct rose to the level of direct criminal contempt.

¶ 24 Again, the first objection consisted of "Objection. Assumes facts not in evidence and also would be hearsay. It also lacks foundation. He also is not the person who did the work, so he wouldn't know." Similarly, the second cited objection asserted, "Objection to excessive and duplicative. There is no evidence of either." In our view, neither of the objections constitute examples of drastically improper speaking objections—at least not to the extent that they would justify a direct criminal contempt finding. While Canulli made other objections that went deeper into "speaking objection" territory, those occurred prior to the trial judge's admonition. Canulli's aggressive style was disruptive and did his client no favors, but we conclude that a direct criminal contempt finding constituted an excessive response by the trial judge. We reverse the two findings of direct criminal contempt entered against Canulli because they are not sufficiently supported by

the record. We also commend the trial judge for her patience and poise in handling a needlessly combative situation.

¶ 25                                    B. Sanctions (Case No. 3-25-0205)

¶ 26         In appeal No. 3-25-0205, Canulli and Breanne present several arguments to support their contention that the trial court erred in awarding Stephen $16,257 in sanctions pursuant to Rule 137 (Ill. S. Ct. R. 137 (eff. Jan. 1, 2018)). A ruling on a motion for sanctions under Rule 137 is within the sound discretion of the trial court and will not be reversed unless an abuse of that discretion is established on appeal. *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill. 2d 560, 579 (2000). An abuse of discretion occurs when no reasonable person would agree with the trial court's decision. *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 16.

¶ 27         The appellants first argue that the sanctions order is invalid because it "is replete with statements, assertions and findings without any citation to the evidence or the Common Law Record," including the finding "that Respondent made no inquiry regarding [Stephen] having other children during the pendency of the trial." The appellants contend that Judge Riordan, who was assigned to the case after the entry of the allocation judgment in 2023, lacked personal knowledge of the evidence presented at trial, which concluded in September 2022 and failed to support her findings with citations to the trial record. Their arguments, however, presume, without basis, that the judge did not review the trial transcript merely because that review was not expressly noted in the order. Without more, the appellants' argument is purely speculative. Further, the trial court stated on the record that it reviewed the relevant transcripts. Indeed, the trial court described portions of some prior testimony in response to Canulli's explanation of some events during a hearing. We reject the appellants' unsupported claims that the trial court did not review transcripts from the prior proceeding and was incapable of making a ruling. We also note that a successor

12

judge may properly issue an order based upon a predecessor judge's findings of fact. *In re Marriage of Ayers*, 82 Ill. App. 3d 164, 167 (1980).

¶ 28        The appellants next contend that the trial court violated Breanne's constitutional right to due process because the sanctions order relied on "motions and matters outside the pleadings." In support, they cite *In re Marriage of Gurda*, 304 Ill. App. 3d 1019, 1026 (1999), which found that the trial court's *sua sponte* act of impounding a party's passport, absent any allegation that he was a flight risk and without giving him an opportunity to respond, infringed on his constitutional right to be heard. The facts in that case are clearly distinguishable from those in the instant case.

¶ 29        Here, the trial court's review of the record led to a conclusion consistent with the allegation in the sanctions motion that the appellants' multitude of posttrial motions were filed "for purposes of unnecessary delay and to needlessly (and vastly) increase the cost of litigation, merely to 'punish' [Stephen]," thus justifying the imposition of sanctions under Rule 137. Although the sanctions order cited two motions filed by the appellants that were not expressly included in Stephen's motion for sanctions, the sanctions motion also asserted that Canulli "has filed no less than thirty motions and pleadings that are excessive, not founded in law, harassing, and most if not all the pleadings or motions were denied." Thus, the full range of motions filed by Canulli and Breanne were properly before the trial court in the sanctions motion. Moreover, the remaining seven motions cited in both the sanctions motion and the trial court's order sufficiently justify the imposition of sanctions.

¶ 30        The trial court held a two-day hearing on the motion for sanctions. It found that Breanne's multitude of filings were interposed for an improper purpose and found her denials in this regard to be self-serving and not credible. That court had the benefit of hearing and seeing the witness testify; this court does not. Thus, we accord great deference to the trial court's findings of fact and

13

credibility because it was best able to observe the witnesses and assess their credibility. *People v. Richardson*, 234 Ill. 2d 233, 265 (2009). We have no persuasive reason to overturn the trial court's credibility determination.

¶ 31    The appellants next contend that the trial court's sanctions order was conclusory and belied by the facts. They maintain that this court must review the order under the test outlined in *In re Estate of Smith*, 201 Ill. App. 3d 1005, 1009-10 (1990), which requires us to examine the trial court's explanation for its decision only, and not the entire record on appeal. The test in *Smith*, however, was expressly abrogated in *Arnold*, 2015 IL 118110, ¶ 16, where our supreme court declared that it was "contrary to the longstanding principle that a reviewing court can 'sustain the decision of a lower court on any grounds which are called for by the record, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct.' [Citations.]" Instead, the supreme court instructed reviewing courts to "focus on whether the record provides an adequate basis for upholding the circuit court's decision to deny sanctions, not on the circuit court's specific reasons for doing so." *Id.* Accordingly, the cases applying the *Smith* test that were cited by the appellants are inapplicable here. We further note that, while we choose not to, the appellants' reliance on a case abrogated by our supreme court would justify the imposition of further sanctions.

¶ 32    The appellants assert the trial court's conclusion that the pleadings listed in the sanctions motion were "repetitive, duplicative, cumulative, and vexatious" and lacked any basis in the record. We disagree. Both the sheer number and substance of the motions filed by the appellants are more than sufficient to support the imposition of sanctions. The record on appeal reveals that the appellants repeatedly made the same claims in over 30 motions, despite those claims often being dressed up in differing verbiage. In its order, the trial court noted one of the most heavily

14

recycled claims: Stephen's failure to reveal that he was having another child with a third party during the pendency of the proceedings. That claim was relied on in at least nine separate unsuccessful pleadings to which Stephen was obliged to respond. In addition, several of the appellant's pleadings claimed to demand "emergency" relief. That claim, however, was readily belied by the facts and circumstances shown in the record as well as the trial court's ultimate rulings. Moreover, the trial court expressly found that Breanne's testimony—asserting that none of those pleadings was imposed for an improper purpose—was not credible, a finding we have declined to reverse on appeal (*supra* ¶ 30). Based on the number and highly duplicative substance of the appellants' pleadings, we reject the argument that the sanctions order lacked a sufficient basis in the facts or the record.

¶ 33 The appellants also argue that the evidence was insufficient to support the award of attorney fees. The procedural vehicle for the fee award here was Rule 137, and not section 508 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/508 (West 2020)), which is distinct in terms of fee awards and consequences for bad behavior. In relevant part, Rule 137(a) states:

> "If a pleading, motion, or other document is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties *the amount of reasonable expenses incurred* because of the filing of the pleading, motion or other document, *including a reasonable attorney fee*." (Emphases added.) Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018).

¶ 34 Thus, when a court determines imposition of Rule 137 sanctions is proper, it has many options at its disposal. These involve " 'a warm friendly discussion on the record, a hard-nosed reprimand

in open court, compulsory legal education, monetary sanctions, or other measures appropriate to the circumstances.' " *Heckinger v. Welsh*, 339 Ill. App. 3d 189, 192 (2003) (quoting *Thomas v. Capital Security Services, Inc.*, 836 F.2d 866, 878 (5th Cir. 1988)). Commonly, the chosen sanction is attorneys' fees. Fees awarded as a sanction need not be directly related to the offensive pleading; in fact, Rule 137 does not require that the moving party incur damages relative to the sanctionable pleading. *Id.* Nonetheless, when a trial court determines that fees are the appropriate metric for a sanction, the fees must be reasonable. See *Century Road Builders, Inc. v. City of Palos Heights*, 283 Ill. App. 3d 527, 531 (1996) (stating "once a trial court finds that a pleading is sanctionable, an evidentiary hearing on the reasonableness of any fees to be awarded is required" and "the issue of reasonableness is a matter of proof which should be subject to cross-examination").

¶ 35        Appellants argue that attorney Traub was required to testify at the sanctions hearing as to her status as a licensed attorney, her usual and customary hourly fee rates, her legal experience, the reasonable need for the fees incurred, and the specific legal services rendered. We agree that best practice, and substantial case law, teaches that a lawyer seeking fees should present a fee petition that is supported by an affidavit detailing the lawyer's level of training and skill, their hourly rates, information that renders the hourly rate reasonable, and detailed copies of their invoices or timesheets. The invoices or timesheets should adequately identify tasks and the time spent on them in 6-minute increments, and without block billing, so that opposing counsel may adequately test the reasonableness of the time spent. A lawyer who does not do these things risks having their fee petition denied. See *In re Estate of Callahan*, 144 Ill. 2d 33, 43 (1991); Ill. R. Pro. Conduct (2010) R. 1.5 (eff. July 1, 2023); *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 983-84 (1987) (detailing information to be provided to the court in a request for fees).

16

¶ 36    And, if a lawyer opposing a fee petition takes the position that an evidentiary hearing is needed to test the reasonableness of the fee request, they may request one. See *Century Road*, 283 Ill. App. 3d at 531. However, our courts have held that "[a]n evidentiary hearing is not always necessary in order to determine reasonable attorney fees if the trier of fact can determine a reasonable amount from the evidence presented ***." *Williams Montgomery & John Ltd. v. Broaddus*, 2017 IL App (1st) 161063, ¶ 49.[1] If the trial judge cannot make that determination, an evidentiary hearing is needed. *Law Offices of Brendan R. Appel, LLC v. Georgia's Restaurant & Pancake House, Inc.*, 2021 IL App (1st) 192523, ¶ 59.

¶ 37    Canulli is correct that Traub's fee petition, and the evidence she presented to support it, could have been more robust. However, Traub's status as a licensed attorney since 2001 is a matter of public record, and we take judicial notice of that. We further note that Traub's time entries were submitted into evidence during an evidentiary hearing, and Canulli questioned Stephen about them. Further, the trial judge was engaged with the parties in *extensive* hearings and motion practice and was intimately familiar with the level of time necessary for the case. Finally, the March 20, 2025, sanctions order reflects that the trial judge was familiar with Traub's experience, reputation, and ability and considered them in connection with determining whether Traub's fees were reasonable and necessary. We cannot say Traub followed best practices in justifying her fee request, but, under the unique facts presented here, we conclude that the trial judge had all the information she needed to determine a reasonable sanction.

---

[1] We recognize the existence of some tension between *Century Road*'s statement that an evidentiary hearing "is required" (*Century Road*, 283 Ill. App. 3d at 531) and the conclusion in *Williams Montgomery & John* that it is "not always necessary." *Williams Montgomery & John*, 2017 IL App (1st) 161063, ¶ 49. We conclude that an evidentiary hearing is *often* necessary, but it depends on the facts and circumstances presented.

¶ 38　　　We also reject the appellants' claim that the evidence failed to establish Stephen's *prima facie* case for sanctions in the first instance. The record contains over 30 posttrial motions filed by the appellants, as well as hearing testimony and over 50 pages of billing information that were offered and subjected to intensive examination and cross-examination. After reviewing the record, we conclude that "all of the evidence, when viewed in its aspect most favorable to the opponent," does not "so overwhelmingly favor[ ] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, at 510 (1967). The testimonial and documentary evidence was sufficient to present a *prima facie* case for sanctions and, thus, survive the appellants' motions for directed findings. Further, we cannot find error in the trial judge's ultimate determination that Rule 137 violations occurred.

¶ 39　　　Finally, the appellants allege that Traub and Stephen committed "fraud by silence" when they did not reveal that Stephen was expecting a child with a third party during the underlying proceedings. They contend that fact affected A.L.G.'s best interests by altering the existing childcare arrangements and ask this court to "address the fraud as it deems appropriate to the circumstances." It is fundamental that the substantive scope of any appeal is limited to the matters raised in the notice of appeal. *Ferguson v. Riverside Medical Center*, 111 Ill. 2d 436, 442 (1985); *Affiliated Health Group, Ltd. v. Devon Bank*, 2016 IL App (1st) 152685, ¶ 27 (stating " '[t]he scope of appellate jurisdiction is fixed by the notice of appeal and by later proper amendment thereto.' *Conley v. Peoples Gas, Light & Coke Co.*, 82 Ill. App. 3d 1094, 1101 (1980)."). Here, the only judgments cited in the appellants' notice of appeal were the denials of their motions for directed findings and the imposition of Rule 137 sanctions. Because the matter raised by the appellants is outside the scope of appeal No. 3-25-0205, we decline to address it.

18

¶ 40	In sum, this court is not persuaded by the appellants' numerous arguments challenging the sanctions order entered against them. Finding no error or abuse of discretion, we affirm the grant of Stephen's sanctions motion pursuant to Rule 137.

¶ 41	C. Various Posttrial Rulings (Case No. 3-25-0293)

¶ 42	In appeal No. 3-25-0293, Breanne challenges numerous rulings made by the trial court after the entry of its allocation judgment. We address those challenges in turn.

¶ 43	1. Reopening Proofs

¶ 44	Breanne first argues that she should have been permitted to reopen the proofs and that evidentiary hearings should have been held on her "several motions which related to the birth of [Stephen's] child and how the child was material to the issues of both parental responsibility-decision making and parental responsibility-parenting time, before" the allocation judgment was entered on June 7, 2023. She argues that the failure to convey that information after the close of the proofs in September 2022 proved that joint parenting was not possible due to Stephen's secretiveness and failure to communicate. She also claims the birth of the new baby was a substantial and material change that adversely impacted A.L.G., pointing to the change in daycare arrangements after the birth of the new baby in May 2023.

¶ 45	In its written order, the trial court acknowledged that Breanne "offered evidence and made allegations during the closing arguments that Stephen was secretive, untruthful, uncommunicative, and untrustworthy and that the parties did not have the ability to jointly parent the minor child." Indeed, the record is replete with evidence relied on by Breanne to show that Stephen was unresponsive and failed to initiate necessary communications relating to A.L.G. The trial court, however, concluded that no credible evidence supported Breanne's claims and, instead, expressly found that Stephen was not "being secretive."

19

¶ 46　　　　During the 15-day trial, the court was able to see the witnesses and assess their credibility. Based only on the dry written record, without the benefit of seeing and hearing the witnesses, we will not overturn the trial court's findings that the evidence offered by Breanne lacked credibility and that Stephen was neither secretive nor unable to communicate with her about A.L.G. See *In re J.A.*, 2025 IL App (1st) 242528, ¶ 36 (" 'Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision.' [Citation.] 'Ultimately, there is a "strong and compelling presumption in favor of the result reached by the trial court" in child custody cases.' [Citation.]"). We also note that Breanne has offered no case law suggesting that the birth of another child constitutes a substantial and material change in circumstances, or even a relevant factor, in determining the proper allocation of parenting responsibilities and time. Indeed, if Breanne were correct, existing parenting orders would be subject to modification whenever either parent had another child. However, she cites no such authority. Because Breanne's argument is not supported by either legal authority or substantial evidence, we find it unpersuasive.

¶ 47　　　　A trial court's ruling on a motion to reopen a case for the submission of additional evidence will not be disturbed without a clear showing of an abuse of that discretion. *Crothers v. La Salle Institute*, 68 Ill. 2d 399, 408 (1977). Here, the trial court ultimately heard evidence about Stephen's failure to provide information about the new baby and the adverse impact Breanne alleges it had on A.L.G. and her care during the multi-day hearing held on Stephen's sanctions petition. During that hearing, Breanne testified that Stephen hid the pregnancy and that the new baby adversely affected A.L.G. On further examination, however, she admitted that having a sibling was not adverse to A.L.G.'s interests. While she asserted that the birth harmed A.L.G. because it

20

precipitated a change in Stephen's childcare arrangements, she offered no evidence showing that the new arrangements were inadequate or harmful to A.L.G. In addition, the allocation judgment permitted both parents to choose the childcare providers used during their parenting time.

¶ 48    In addition, Breanne's reliance on *In re Marriage of Carrillo*, 372 Ill. App. 3d 803, 806 (2007), is misplaced. That decision held that the trial "court correctly denied [Stephen's] motion to reopen the proofs *so that he could elicit inadmissible evidence of attorney strategy.*" (Emphasis added.) *Id.* at 816. Similarly, here the allegations in Breanne's posttrial motions, premised on Stephen's failure to reveal the new baby, were found to be "repetitive, duplicative, cumulative, and vexatious." See *supra* ¶ 32. We cannot say that the denial of the motion to reopen the proofs was a clear abuse of the trial court's discretion.

¶ 49                                    2. Child Support

¶ 50    Breanne relies on *In re Marriage of Pleasant*, 256 Ill. App. 3d 742 (1993), to argue that the trial judge improperly relied on information obtained outside the trial process, but that case is inapposite. In overturning the trial judge's restriction on a parent's visitation rights, the appellate court noted that the judge had "improperly relied on his personal belief that homosexuality creates serious endangerment" and "included a section 'HOMO SEXUALITY,' which was based on a book that was not introduced into evidence or even mentioned during the proceedings." *Id.* at 754-55. The court concluded that the outside information was completely irrelevant to the parent's visitation rights and should not have been used in the trial court's decision-making process. Here, however, the trial court did not rely on completely irrelevant outside materials or reveal any inherent personal prejudice or bias.

¶ 51    Next, Breanne asserts she was denied due process when the trial court entered the allocation judgment during a hearing held one day prior to the scheduled judgment date. She claims that the

change denied her an opportunity to present 11 alleged errors in the judgment, which was drafted by Stephen's counsel. She also contends she was denied her right to request oral testimony under section 2-1112 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1112 (West 2022)). Initially, we note that both of these assertions may be more accurately described as being alluded to rather than being fully argued in this court.

¶ 52 Nonetheless, the record shows that the trial court orally issued a partial ruling on April 7, 2023, in contemplation of the entry of its final judgment on June 8, 2023. Noting that the parties used different methods to calculate child support, the trial court requested that they submit additional information and calculations relating to child support. The trial court also stated its intention to have Stephen's counsel prepare the final order based on the court's stated findings. At a hearing on May 8, 2023, the trial court acknowledged receipt of both parties' proposed final orders and dictated in great detail how it wished the two drafts to be combined to reflect its intended judgment. Because the trial court intended to make child support retroactive to January 1, 2021, it directed counsel to discuss the credits Stephen should receive for payments made after that date. The court directed Stephen's counsel to draft and submit a final order consistent with the changes made by the court prior to the entry of its final judgment on June 8. 2023.

¶ 53 On June 5, 2023, Breanne's counsel sent an e-mail purporting to "correct" 11 alleged errors in the draft final order prepared by opposing counsel to conform to the evidence and prior court rulings. Stephen's counsel did not incorporate those changes into the draft order. Two days later, the trial court held a hearing to address several of Breanne's recent emergency motions. During that hearing, the court declared that it had reviewed the final order prepared by Stephen's counsel, declared that it conformed to the court's intended ruling, and announced it would be entered immediately, not on June 8, 2023, as originally planned.

22

¶ 54   On appeal, Breanne argues that she was denied due process when she was unable to present the 11 alleged errors to the trial court prior to the entry of its final judgment on June 7, 2023. After reviewing those alleged errors, we disagree. Each involved mere typographic errors; minor, non-substantive, wording changes; or disagreements on the proper financial figures to be used. While Breanne may have disagreed with the monetary values adopted, the trial court confirmed that the draft order represented its final judgment. Thus, the few "substantive" errors alleged by Breanne accurately reflected the trial court's intended findings. After the extremely lengthy and contentious proceedings, which spanned multiple years, the trial court was undoubtedly familiar with the differing sums posited by the parties and was entitled to make its findings without further input based on its review of the record. No due process violation occurred.

¶ 55   Turning next to Breanne's claim that she should have been able to request the submission of oral testimony under Code section 2-1112 (*id.*)), we again find no violation. The record indisputably shows that Breanne had already offered extensive oral testimony at trial on those issues. Section 2-1112 does not entitle her to submit more evidence indefinitely.

¶ 56   She also claims that Judge Riordan's orders on the posttrial motions were reversible error because a judge could not rule on matters she had not overseen at trial. Moreover, Breanne maintains that Judge Riordan "knew nothing about the case" and had not "read the transcript of the hearing because they [*sic*] had not yet all been transcribed." We reject this claim for two reasons.

¶ 57   First, the record belies any claim that Judge Riordan ruled without reading the transcripts or having any knowledge of the underlying trial. When confronted with a similar claim at an August 2, 2023, hearing, Judge Riordan repeatedly explained that she could obtain any transcripts needed to decide the posttrial motions. She also specifically stated during the October 19, 2023,

23

hearing on the remaining posttrial motions that she had already reviewed all the relevant transcripts and "[knew] what happened." Absent any evidence to the contrary, we will not presume that those statements were inaccurate or disingenuous. *Supra* ¶ 27. Second, Breanne offers no legal authority to support her claim. The appellants are advised that they may not shift the burden of conducting essential legal research onto this court. *People v. Safranek*, 2025 IL App (4th) 240967, ¶ 118. For those reasons, we reject Breanne's claim that Judge Riordan's posttrial rulings constituted *per se* reversible error.

¶ 58         Breanne also argues that the child support award must be reversed because the health insurance premiums included in the support calculation lacked any evidentiary basis. Once again, the record contradicts the claim that no evidence of the health insurance premiums was adduced during the proceedings. At a minimum, the trial record includes a copy of Stephen's paystub and testimony about the premium paid. Both parties testified that Stephen had been exclusively paying those premiums for the child, with no contribution from Breanne, since her birth. In addition, Stephen's counsel submitted child support guideline worksheets, as requested by the trial court prior to the entry of the June 2023 judgment, and Breanne did not contradict those values. Because the facts do not clearly establish the opposite conclusion, we conclude that the health insurance premiums used by the trial court to calculate Stephen's child support were not against the manifest weight of the evidence. See *In re Parentage of A.H.*, 2023 IL App (1st) 190572, ¶ 99 (stating the standard of review). Moreover, we hold that the child support awarded to Breanne was not an abuse of that court's sound discretion. *Id.* (stating that a child support award will be reversed only if it constitutes an abuse of the court's discretion).

¶ 59                                  3. Retroactivity of Child Support

¶ 60          Breanne maintains that the trial court was required to make child support retroactive to

January 9, 2020, the date Stephen filed his petition to establish paternity. Instead, the trial court

ordered retroactive support from January 1, 2021. We review an award of retroactive child support

for an abuse of discretion. *In re Marriage of Juiris*, 2018 IL App (1st) 170545, ¶ 18.

¶ 61          Breanne argues that the plain language of section 602(a) of the Illinois Parentage Act of

2015 (Parentage Act) (750 ILCS 46/602(a) (West 2022)) requires child support to be retroactive

to the date of Stephen's filing. The statutory language she quotes states that "[t]he court shall order

all child support payments *** to commence with the date summons is served." That language,

however, is not found in section 602(a). Rather, it is found in section 802(a) of the Parentage Act

(*id.* § 802(a)). The portion of the statute requiring child support to be retroactive to the time the

"summons [was] served" is the key to evaluating Breanne's claim. See *id.*

¶ 62          She contends that January 9, 2020, the date Stephen filed his paternity petition, is the proper

starting point for the retroactive child support. That petition, however, was filed pursuant to section

607 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/607 (West 2020)) and

requested only a division of parenting time and decision-making responsibilities. The issue of child

support under the Parentage Act did not arise until Breanne filed her counterpetition on March 9,

2020. Under the plain language of section 802(a) of the Parentage Act (750 ILCS 46/802(a) (West

2020)), the trial court's award of child support to Breanne should have been retroactive to March

10, 2020, the date service was made on her counterpetition seeking relief under that statute.

Accordingly, we reverse the award of retroactive child support and remand the issue to the trial

court for consideration of whether Stephen was entitled to any credits against that award for

25

support payments he made between March 10, 2020, and January 1, 2021, the starting date of the trial court's original retroactive support order.

¶ 63                              4. Health Insurance Premiums

¶ 64        Breanne argues that the trial court erred by ordering her to pay a portion of the health insurance premiums Stephen paid to cover A.L.G. because his paternity petition did not expressly seek contribution for those costs. In Breanne's counterpetition to establish paternity and allocate parenting time and responsibilities, as well as her motion for temporary and permanent child support and allocation of expenses, she requested that Stephen be ordered to pay for the child's health insurance.

¶ 65        To support her argument, Breanne cites *Newton v. Aitken*, 260 Ill. App. 3d 717, 718 (1994), in which the plaintiff initially "sought an accounting and damages for fraud" but at trial "raised the issue of fiduciary duty and sought several remedies not pleaded, including constructive trust, contract reformation, and a declaratory judgment." Because those additional issues had not been pled, they were held to have been waived.

¶ 66        Here, in contrast, Stephen's petition broadly requested the allocation of parenting time and responsibilities. While he did not expressly seek the sharing of the costs he incurred in providing the child's health insurance, that expense is a necessary and implicit part of typical parental responsibilities; it is not a separate and distinct issue, as in *Newton*. Stephen was not required to list each one of the responsibilities typically borne by parents when seeking the allocation of the relevant expenses and duties between the parties. The plain and ordinary meaning of Stephen's broad request necessarily encompasses the allocation of the responsibility for maintaining and paying the child's health insurance and other necessary expenses. He did not waive his right to that relief.

26

¶ 67     Next, Breanne asserts that she was denied due process because she did not receive notice and a meaningful opportunity to be heard on how health insurance expenses would be split. That claim, however, is belied by the record. Both sides had the opportunity to submit testimony and evidence about the premium payments. In addition, Breanne's counterpetition sought an order requiring Stephen to "provide and maintain health, dental and vision and any other form of insurance for the benefit of the minor child, also that [he would] contribute a greater share of the child's uncovered medical, dental and vision expenses." The record clearly establishes that both parties had the opportunity to provide testimony, exhibits, and financial worksheets to the trial court, addressing the proper allocation of the responsibility to provide for the child's health insurance and associated costs. No due process violation occurred.

¶ 68     Breanne also contends that the evidence did not support the amount and "retroactivity" of the health insurance premiums she was ordered to pay. Although the premiums and income data included in the record and the financial worksheets provided to the trial court varied between the parties, we cannot say that the decision to allocate 62% of a total monthly premium expense of $281 to Stephen and 38% to Breanne was an abuse of discretion. We also reject Breanne's claim that "[t]his was not a going forward order to pay, but a retroactive order to pay which obligated [Breanne] *** to pay money under penalty of contempt where there was no pleading on file." The trial court's order did not require her to make additional "retroactive" payments to Stephen, who had previously paid the full cost of the premiums. Rather, the order merely credited Stephen for the premiums he paid after the effective date of the final child support order. We find no abuse of the trial court's discretion.

27

¶ 69                                    5. Reassignment of the Case

¶ 70        Underlying a number of Breanne's arguments is the contention that the original trial judge, Richard D. Felice, should not have recused himself after trial and reassigned the posttrial motions to Judge Maureen R. Riordan. Breanne maintains that Judge Felice's failure to resolve pending posttrial motions and subsequent reassignment of the case to Judge Riordan was an abuse of discretion that invalidated the ultimate rulings on those motions.

¶ 71        The issue of whether the posttrial motions were properly reassigned to Judge Riordan has already been addressed by this court in a prior appeal. In *In re A.G.*, 2024 IL App (3d) 240003-U, ¶¶ 46-47, this court previously rejected Breanne's challenge to the reassignment of this case. We will not reconsider that decision now.

¶ 72                                        6. Name Change

¶ 73        Finally, Breanne argues that the trial court erred in denying her request to change the minor child's name to include her surname without an evidentiary hearing. She claims that "[t]he name change statute, [(735 ILCS 5/21-102.5 (West 2022))] requires the trial court to consider all of the factors relating to the allocation of parental responsibilities as described in 750 ILCS 602.5 and 607.5 which *** cannot be decided in a non-evidentiary proceeding." It does not. Section 21-102.5 makes no mention of either section 602.5 or 607.5. It merely provides for objections to a name change request if the affected person has been charged with or adjudicated for a felony or a misdemeanor. 735 ILCS 5/21-102.5 (West 2022). That provision has no relevance to the issues in the instant appeal.

¶ 74        Breanne further contends that "[t]he [c]ourt must take evidence to consider the statutory factors and objectively reasonable [*sic*] cannot be decided in a non-evidentiary hearing." She provides no legal authority for her contention. We again remind her that she alone bears the burden

28

of conducting the necessary legal research to provide valid citations to the legal authority needed to substantiate her arguments on appeal. *Safranek*, 2025 IL App (4th) 240967, ¶ 118; *supra* ¶ 66.

¶ 75　　　In its order, the trial court noted that, under section 21-101, a name change request for a minor will be granted "only if the court finds by clear and convincing evidence that the change is necessary to serve the best interests of the child." 735 ILCS 5/21-101(c) (West 2022). To determine the child's best interest, the court must examine all relevant factors, including (1) the wishes of the parents and the child, (2) the child's "interactions and interrelationships" with the parents and others having a significant impact on her best interests, and (3) the child's adjustment to her home and community. *Id.* In reviewing those statutory factors, the trial court found that the wishes of the parents and child did not favor either side, that "the child has a loving relationship with both parents and the child benefits from extended family relationships," and that she was well adjusted to both parents' homes.

¶ 76　　　The order also acknowledged Breanne's argument that the combined last name would "foster stability and a closer relationship between mother and child" and "have a positive impact for travel, and relationships within the home, school, community and for athletic and other activities." The court, however, noted that the parties "share equal parenting time" and "that there has been nothing presented to the court that would indicate the [mother] has anything other than a strong relationship with the child," who it found to be "well-adjusted." Based on those findings, the trial court concluded that Breanne had "failed to meet the burden of clear and convincing evidence that a name change is necessary," as required by the statute.

¶ 77　　　Although the trial court had already heard evidence relating to the child's general best interests prior to the close of evidence in September 2022, the name change motion was not filed until January 10, 2023, months after the close of evidence. Because the trial court did not conduct

29

an evidentiary hearing on that issue, it was unable to hear or assess any evidence specifically relating to how the child's best interests would have been affected by a name change. Without that evidence, the trial court could not properly evaluate Breanne's request to change the child's name. Accordingly, we reverse the trial court's denial of Breanne's motion for a name change and remand the cause for a straightforward evidentiary hearing on that narrow issue. We offer no view on the merits of whether the name change request ought to be granted.

¶ 78                                  III. CONCLUSION

¶ 79        For the reasons stated, we reverse the two direct criminal contempt findings of the circuit court of Du Page County in appeal No. 3-25-0124. We affirm the award of sanctions to Stephen pursuant to Rule 137 in appeal No. 3-25-0205. In appeal No. 3-25-0293, we reverse the trial court's award of retroactive child support and remand the cause for the entry of an award of retroactive child support to March 10, 2020, as well as the trial court's consideration of any offsetting credits Stephen is due for support payments he made between March 10, 2020, and January 1, 2021. We also reverse the denial of Breanne's motion for a name change without an evidentiary hearing and remand the cause to the trial court for additional evidentiary proceedings. We affirm the remainder of the orders raised in that appeal.

¶ 80        Affirmed in part and reversed in part.

¶ 81        Cause remanded.

30

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 20-F-16; the Hon. Maureen R. Riordan, Judge, presiding. |
| **Attorneys for Appellant:** | Michael D. Canulli, of Naperville, appellant *pro se*. |
| **Attorneys for Appellee:** | No brief filed for appellee. |